## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| PHILIP E. LANE, M.D. | ) | **FILED** |
| | ) | **JANUARY 30, 2008** |
| Plaintiff | ) | MICHAEL W. DOBBINS |
| | ) | CLERK, U.S. DISTRICT COURT |
| vs. | ) | |
| | ) | **PH** |
| GREAT LAKES ANESTHESIA, P.C., an | ) NO: | **08 C 652** |
| Indiana Professional Corporation; | ) | |
| UNIVERSITY ANESTHESIOLOGISTS, | ) | **JUDGE DARRAH** |
| S.C., an Illinois Professional Corporation; | ) | **MAGISTRATE JUDGE BROWN** |
| and CHICAGO ANESTHESIA | ) | |
| ASSOCIATES, an Illinois | ) | |
| Professional Corporation | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT and DEMAND FOR JURY TRIAL

### Introduction

1.      This Complaint filed by Plaintiff, Philip E. Lane, M.D. ("Lane") against these defendants alleges:

(i)      that Defendant Great Lakes Anesthesia, P.C. ("Great Lakes"), an Indiana corporation wrongfully breached its employment agreement with Lane (A copy of the Employment Contract is attached hereto as Exhibit 1).

(ii)      that University Anesthesiologists, S.C. ("UA") breached the confidentiality and agreed reference provisions in its Settlement Agreement with Lane (the "12/21/06 Agreement") by deliberately and improperly communicating negative and derogatory information to Great Lakes concerning Lane's performance as an employee of UA that resulted in the termination of Lane's contract with Great Lakes.  (A copy of the Settlement Agreement is attached hereto as Exhibit 2).

(iii)    that communications from UA's employees and/or agents to Great Lakes tortuously interfered with Lane's employment agreement with Great Lakes;

(iv)    that UA breached the confidentiality and agreed reference provisions in the 12/21/06 Agreement by deliberately and improperly communicating negative and derogatory information concerning Lane's performance as an employee of UA to Dr. Kiokmeister, Chief of Anesthesia at the 900 North Michigan Avenue Surgery Center ("900 North") resulting in the termination of employment contract discussions and loss of an opportunity for full-time employment;

(v)    that UA breached the confidentiality and agreed reference provisions in the 12/21/06 Agreement by deliberately and improperly communicating negative and derogatory information concerning Lane's performance as an employee of UA to Chicago Anesthesia Associates, P.C. ("CAA") resulting in CAA's deliberate and wrongful breach of Lane's oral agreement with CAA; and

(vi)    that CAA breached an oral agreement with Lane wherein CAA agreed that if Lane (i) performed certain tasks as requested by Kenneth Candido, M.D. ("Candido"), the sole owner of CAA, and (ii) performed his clinical duties satisfactorily, CAA would tender an employment agreement to Lane when CAA assumed full responsibility for the Advocate Illinois Masonic Medical Center ("Masonic") Department of Anesthesia ("Masonic Department").

## Jurisdiction and Venue

2.    This court has jurisdiction pursuant to 28 U.S.C. §1332 based on diversity of citizenship of Great Lakes, an Indiana Professional Corporation and the fact that the claims against each defendant has a value in excess of $75,000.

3.      Venue is proper in the Northern District of Illinois in that the majority of the alleged violations of Illinois law occurred in the Northern District of Illinois; (ii) with the exception of Great Lakes, all of the parties are domiciled in the Northern District of Illinois, and (iii) the alleged "tortuous" behavior originated in Illinois.

## Parties

4.      Plaintiff Philip E. Lane M.D. ("Lane") is a citizen of the United States and a resident of the City of Chicago.

5.      Defendant Great Lakes Anesthesia, PC ("Great Lakes") is an Indiana professional corporation with its principal offices in Elkhart, Indiana.   Great Lakes is domiciled in Indiana and is not qualified to transact business in Illinois.

6.      Defendant University Anesthesiologists, S.C. ("UA") is an Illinois for-profit business corporation with its principal place of business located at Rush Medical Center ("Rush").   UA has an agreement with Rush to be the exclusive provider of anesthesiology services at the Medical Center and several other entities owned by or affiliated with Rush.

7.      Defendant Chicago Anesthesia Associates, P.C. ("CAA") is a for profit business corporation incorporated under the laws of the state of Illinois with its principal place of business located at Masonic.

## FACTS

**A.      Lane's Separation Agreement with UA.**

8.      Lane was hired by UA under terms of an Employment Agreement between UA and Lane dated December 28, 2001.

9.     Lane terminated his employment with UA on December 31, 2006.

10.     Prior to Lane's departure from employment, Lane and UA negotiated the terms and conditions of his separation from UA.

11.     At the conclusion of the separation negotiations, Lane and UA executed the 12/21/06 Agreement.

12.     The 12/21/06 Agreement specified that the terms and conditions of the Agreement would remain confidential and that all inquiries for references would be answered per the specific language in the 12/21/06 Agreement.

13.     The specific language to be used in response to all inquiries from prospective employers was a material term of the 12/21/06 Agreement.

**B.     Employment by Great Lakes.**

14.     On February 11, 2007 Lane traveled to Elkhart, Indiana and met with Jim Carr, CRNA ("Carr"), President of Great Lakes, Dana Hoffman, D.O., and Paul Henderson, CRNA ("Henderson"), to discuss the possibility of Lane taking a full-time position with Great Lakes.

15.     During lunch, immediately following the interview, Lane was offered a position with Great Lakes. The offer was orally reconfirmed in a telephone call to Lane from Henderson, within one (1) hour of Lane's departure from Elkhart.

16.     On February 12, 2007, Great Lakes sent Lane a package containing a welcome letter, contract, and description of benefits.

17.    On February 13, 2007 Lane received the package from Great Lakes. Lane made no changes and signed the Employment Agreement sending one copy back to Great Lakes via facsimile and the signed original via Federal Express.

18.    Lane spent the next several days communicating with Linda Anderson, Great Lake's Office Manager, providing information so that Lane's credentials could be approved by the various sites where Lane would provide anesthesia.

19.    On February 19, 2007 Lane was advised by CompHealth, the *locums* and permanent placement service that had arranged the interview between Lane and Great Lakes, that Henderson had called and advised CompHealth that Great Lakes was terminating its employment agreement with Lane. During that telephone conversation no reason for the Great Lakes' action was given.

20.    Lane contacted Henderson directly that same day. In the conversation Henderson advised Lane that he had contacted friends in the Rush Anesthesia Department, all either employees and/or agents of UA, and he had "heard things he did not want to hear."

21.    Approximately ten (10) days after his conversation with Henderson, Lane called Carr.

22.    Carr then confirmed that Henderson had received very negative information from his contacts at UA and that Great Lakes would not, under any circumstances, employ Lane.

**C.    Lane's Contacts with 900 North SurgiCenter, Chicago.**

24.    Following the termination of Lane's employment agreement by Great Lakes, CompHealth subsequently arranged an interview with Jay Kiokmeister, M.D., Chief of Anesthesiology at 900 North.

25.    Lane had four (4) separate discussions with Dr. Kiokmeister in late February and March, 2007.

26.    During Lane's second visit to 900 North, Lane was touring the operating suites and met other staff and physicians who used the SurgiCenter.

27.    One of the physicians present that day was Jonathon A. Myers, M.D. ("Dr. Meyers"), a surgeon on the Rush Medical Staff.

28.    On Lane's next visit, Dr. Kiokmeister stated that Dr. Meyers had told him that although he, Dr. Meyers, had always gotten on well with Lane, he had "heard" that Lane had "problems" with other surgeons at Rush.

29.    Dr. Kiokmeister told Lane of his personal disappointment because prior to receiving the communication, he had hoped that Lane would be available to both work at 900 North and also help him (Dr. Kiokmeister) with administrative duties at 900 North.

30.    Dr. Kiokmeister told Lane that following the conversation with Dr. Myers, he contacted unnamed employees and/or agents of UA for further discussion of Dr. Lane's performance as an employee of UA.

31.    On information and belief, that, in violation of the 12/21/06 Agreement, unnamed employees and/or agents of UA improperly communicated negative and derogatory information to Dr. Kiokmeister.

32.    As a direct result of the communications from UA, Dr. Kiokmeister did not offer Lane an employment contract.

**D.    The Contract with CAA.**

33.    At all times relevant to this proceeding, Candido was President and sole owner of CAA.

35.    On or about August 24, 2008, a temporary placement service advised Lane that a long-term temporary position was available at Masonic.

36.    Lane was hired by Arthur Klowden, M.D. ("Klowden"), Vice-Chair of the Masonic Department as a *locum tenens* to provide anesthesia services at Masonic.

37.    Klowden, then an employee of Lake View Anesthesia, P.C., (CAA's predecessor) informed Lane that he (Klowden) would continue as a member of the Masonic Department after CAA took over as the exclusive contract anesthesia provider.

38.    On September 17, 2007, while at the Masonic Medical Staff Office, Lane learned that Candido was the principal owner of CAA and would be the new Chair of the Masonic Department of Anesthesia.

39.    Lane, who had known Candido for more than ten (10) years and had worked with Candido at Cook County Hospital in 1997 and 1998 called Candido on September 17, 2007.

40.    During that initial telephone conversation, Candido welcomed Lane to the Masonic Department and noted that Lane would be Candido's "eyes and ears" until

Candido took over as full-time Chair of the Masonic Department sometime in January 2008.

41.    Candido told Lane to advise the Masonic Department staff of their personal relationship and asked Lane to "tell the staff what a good guy he (Candido) was" and he also told Lane that CAA would offer Lane a contract to start full time when CAA's exclusive services arrangement was effective.

42.    Lane's first day of employment as a *locum tenens* at Masonic was September 21, 2007.

43.    Lane and Candido met at Masonic on September 22, 2007.

44.    Candido also met with the Masonic anesthesia residents on September 22, and advised them, in Lane's presence, that Lane would be coming on board with CAA.

45.    Following the meeting with the Masonic residents, Candido asked Lane to contact James Markey, M.D. and ask him if he would be interested in also coming on board at Masonic.

46.    Lane placed several calls to Dr. Markey but Dr. Markey never responded.

47.    Lanes's next contact with Candido was by telephone on October 23, 3007. During that conversation, Candido advised Lane that both Dr. Salem, retiring Chair of the Masonic Department and Klowden, Associate Chair, were very complimentary concerning Lane's tenure at Masonic.

48.    During the October 23, 2007 telephone conversation, Candido again stated that Lane was a welcome member of the staff and that CAA would be sending all the anesthesiologists a continuing employment contract.

49.     On November 1, 2007 Lane sent an email to Candido saying he was waiting for contract.   Candido responded by e-mail and suggested that Lane should meet him at the Midwest Anesthesia Conference in Chicago the following day.

50.     At the conference Candido told Lane that his attorneys sent him a draft to approve, that the language would be approved on Sunday, November 3 and a contract would be sent to Lane on November 4.

51.     Lane, still without the promised contract, next communicated with Candido on November 20, 2007.

52.     During this entire period Lane performed duties assigned by Candido as requested.

53.     On or about November 20, 2007, for the first time, Candido advised Lane that he wanted further references and asked if specific individuals at Rush could write recommendations for Lane.

54.     The individuals Candido named had not worked with Lane and Lane suggested that recommendations from his two months service at Masonic were readily available.

55.     Candido agreed and asked that the references from Masonic physicians be in his hand by December 1, 2007.

56.     The requested references were timely delivered.

57.     On or about December 3, 2007, after learning that CAA was sending out its contracts to some of the other anesthesiologists, Lane asked Candido the status of his

Employment Agreement. Candido again stated his clear intention that Lane would soon have a full-time employment agreement with CAA.

58.   Candido next communicated with Lane at the Masonic Christmas Party (12/21/2007) where Candido approached Lane and told Lane once again that he intended to provide Lane with a contract.

59.   Klowden spoke with Candido during or shortly after the Masonic Christmas Party.

60.   Following that conversation Klowden told Lane that Candido said that Lane was welcome to continue to work in the Masonic Department as *locum tenens* in January and February (2008) and that Candido would further evaluate the situation when he actually arrived on site on or before February 1, 2008.

60.   Klowdon again spoke with Candido on January 3, 2008. Klowden then told Lane that Candido said he (Candido) had become aware that a "problem" had occurred at Rush during Lane's term of employment with UA.

61.   Candido also told Klowden that Candido had asked Lane to supply Rush references but Lane had refused.

62.   The Rush reference list was in Lane's Masonic Medical Staff credential file since early September 2007 and was always available to Candido as incoming Chair.

63.   Nevertheless, on Friday January 4, 2008, Lane provided CAA with an extensive reference list of Rush faculty and invited Candido to contact anyone he wished.

64.     On Sunday January 6, 2008, Candido sent Lane an email stating that CAA was not going to employ Lane.

65.     On Friday Jan 11, 2008, Lane was advised that CAA's counsel had written a letter to CompHealth, stating that CAA was invoking the fifteen (15) day cancellation clause in Lane's *locum tenens* agreement and that Lane's last day at Masonic would be January 25, 2008.

**E.     Candido's conduct during September 2007 through January 2008.**

66.     Candido initially made promises to residents and other staff concerning meetings he would hold and tasks he would need to do to orient himself to the Masonic Department before taking over in January.

67.     Candido promised to have a series of meetings with the resident staff between October and November 2007. None of the meetings were held.

68.     Candido told the residents he would meet with each of them individually before December 1. None of those one on one meetings were held.

69.     Virtually none of Candido's promised actions to communicate as incoming Chair of the Masonic Department made during the September 2007 through January 2008 period happened.

70.     Between October and December 2007, Candido rarely returned either telephone calls or e-mails from residents or attendings including those from Drs. Klowden, Lane, Caplan and Werner.

71.     Candido was rarely on premises at Masonic and was not, on information and belief, present in the Masonic operating suites during normal business hours between September 17, 2007 and January 25, 2008.

72.    Candido regularly failed to attend meetings with residents and attending staff alike.

73.    Candido's puzzling approach to the transition left an additional burden for all of the Masonic Department attendings in that there was no direction, no policies and procedures in place that had been developed by CAA, and no consistent line of management authority (nobody in charge).

74.    Lane, among others, was required to fill the management void and proactively establish operating schedules, develop lines of communications with the residents, and initiate and oversee residency training, all without input from Candido as the incoming Chair of the Masonic Department.

## COUNT I

### UA'S BREACH OF THE 12/21/06 AGREEEMENT

75.    The allegations in Paragraphs 1 – 74 above are incorporated in their entirety into this Count I as if pleaded herein.

76.    The 12/21/06 Settlement Agreement remains a valid and enforceable contract between UA and Lane.

77.    The 12/21/06 Agreement required that UA not disparage Lane in communications with any other party and specifically provided language for references when potential employers made such inquiries.

78.    Notwithstanding the provisions of the 12/21/06 Agreement, UA has on three (3) separate occasions improperly communicated extremely negative and derogatory information to Lane's potential employers.

79.    As a result of the communication by a UA employee and/or agent, a valid and binding employment agreement between Great Lakes and Lane was terminated.

80.    After the termination of the Great Lakes employment agreement, Lane contacted UA and demanded that future communications with potential employers be consistent with the 12/21/06 Agreement.

81.    Lane was assured that all responses to inquiries for references from UA would be consistent with the 12/21/06 Agreement.

82.    The Great Lakes incident was followed by communications to and from the head of the anesthesia service at 900 North (Dr. Kiokmeister) and resulted in the termination of employment discussions that, according to Dr. Kiokmeister, were headed to a successful conclusion.

83.    The 900 North incident was recently followed by communications to Candido by a UA employee and/or agent that resulted in the termination of a binding oral contract between CAA and Lane.

84.    In spite of receiving notice of their failure to adhere to the terms of the Agreement, UA continued blatantly disregard its contract obligations.  The negative and derogatory communications to 900 North (Dr. Kiokmeister) and CAA (Dr. Candido) occurred well after the discussions with UA concerning the Great Lakes fiasco.

85.    The communications to 900 North and CAA were a clear breach of the terms and conditions of the 12/21/2006 Agreement.

86.    The communications to 900 North and CAA by UA employees and/or agents were knowing, deliberate and calculated to harm Lane's opportunity to secure full time employment.

87.    Lane has suffered severe economic loss as valuable full time positions have been denied to Lane because of UA's deliberate and wrongful conduct.

88.    Lane has been damaged both by loss of income and the costs of searching for employment outside the Metropolitan Chicago service area.

89.    A continuation of this malicious and deliberate conduct by UA will, as a practical matter, foreclose any future employment opportunities for Lane in the Metropolitan Chicago service area.

**WHEREFORE** Lane requests that this court enter judgment for Lane and:

A.    Award damages for UA's deliberate and wrongful breach of the 12/21/06 Agreement in an amount greater than $75,000; and

B.    Such other relief as this Honorable Court shall deem appropriate.

## COUNT II

## <u>UA'S TORTIOUS INTERFERENCE WITH THE GREAT LAKES EMPLOYMENT CONTRACT</u>

90.    The allegations in Paragraphs 1 through 89 above are incorporated into this Count II as if pleaded therein.

91.    On or about February 13, 2007, Great Lakes offered and Lane accepted an employment agreement for a full time position with Great Lakes.

92.    Henderson told Lane that after the offer and acceptance of the Great Lakes employment agreement, he communicated with unnamed employees and/or agents of UA regarding Lane's former employment there.

93.    The employees and/or agents of UA were aware of the terms and conditions, and specifically, the agreed reference provisions, of the 12/21/2006 Agreement.

94.    The employees and/or agents of UA also knew that Henderson was calling because Great Lakes was considering offering Lane an employment agreement.

95.    Notwithstanding the knowledge of UA's employees and/or agents, UA improperly communicated extremely negative and derogatory information concerning Lane's performance as a UA employee.

96.    UA's shareholders, employees and agents were aware that such communication would harm or more likely end employment discussions between Great Lakes and UA.

97.    Once he signed and returned the employment agreement from Great Lakes, Lane had a reasonable expectation that he would be a full time employee of Great Lakes.

98.    Henderson told Lane that he received information from the unnamed UA employees and/or agents that "he [Henderson] did not want to hear" and Carr confirmed that the receipt of the information caused Great Lakes to breach and terminate its employment agreement with Lane.

**WHEREFORE** Lane requests that this court enter judgment for Lane and:

A.  Award damages for UA's wrongful conduct in interfering with Lane's employment contract with Great Lakes in an amount greater than $75,000; and;

B.  Such other relief as this Honorable Court shall deem appropriate.


## COUNT III

## UA'S TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE – 900 NORTH

99.    The allegations in Paragraphs 1 through 98 above are incorporated into this Count III as if pleaded therein.

100.    In ____ 2007 Lane interviewed with Dr. Kiokmeister, head of anesthesia services at 900 North for a full-time position with his anesthesia group.

101.    During Lane's second tour of the 900 North facility, he met a former Rush colleague, Jonathon Meyers, M.D., who was performing a procedure in one of the 900 North operating suites.

102.    Shortly after the second tour of the facilities ended, Dr. Meyers informed Dr. Kiokmeister that although he (Dr. Meyers) had always gotten on well with Lane, he had "heard" that Lane had problems with other Rush Medical Center surgeons.

103.    On information and belief, Dr. Kiokmeister then communicated with employees and/or agents of UA concerning Lane's tenure while an employee of UA from 2001 through 2006.

104.    The employees and agents of UA were aware of the terms and conditions of the 12/21/2006 Agreement, specifically the agreed reference provisions when receiving inquiries from a potential employer of Lane.

105.    The employees and/or agents of UA knew that the purpose of Dr. Kiokmeister's inquiry was to obtain a reference in connection with an application for employment Lane had submitted to 900 North.

106.    Notwithstanding the knowledge of UA's employees and/or agents, UA improperly communicated very negative and derogatory information concerning Lane's performance as an employee of UA.

107.   UA's employees and/or agents were aware that communicating negative and derogatory reference information would cause 900 North to terminate its employment discussions with Lane.

108.   Shortly after discussions with employees or agents of UA, Dr. Kiokmeister did in fact inform Lane that he would not be offered an employment agreement with 900 North.

109.   Lane suffered severe economic loss in that (i) Lane had stopped interviewing for positions; (ii) Lane lost income for a period of time that income would not have been lost but for the UA communications; and (iii) Lane incurred additional expenses in interviewing for positions outside the Metropolitan Chicago service area.

**WHEREFORE** Lane requests that this court enter judgment for Lane and:

A.  Award damages for UA's wrongful conduct in interfering with Lane's potential employment relationship with 900 North in an amount greater than $75,000; and

B.  Such other relief as this Honorable Court shall deem appropriate.

## COUNT IV

### UA'S TORTIOUS INTERFERENCE WITH A PROSPECTIVE BUSINESS ADVANTAGE WITH CAA

111.   The allegations in Paragraphs 1 through 109 above are incorporated into this Count IV as if pleaded therein.

112.   Candido had numerous conversations with Lane about his (Lane's) future relationship with CAA.

113.    Candido had, on several occasions, asked Lane to (i) work with residents in training and teaching; and (ii) communicate for him at Masonic Department meetings during the interim period of the transition to CAA as the exclusive provider of anesthesia services at Masonic.

114.    CAA agreed to offer Lane a contract if he served as its *de facto* representative and if Lane's clinical performance as a *locum tenens* at Masonic was satisfactory.

115.    At some point between November 1, 2007, and December 31, 2007, Candido had conversations with employees and/or agents of UA concerning Lane's performance as an employee UA from 2001 through 2006.

116.    The employees and/or agents of UA also knew that the purpose of Dr. Candido's inquiry was a reference in connection with a future employment opportunity for Lane with CAA.

117.    The UA employees and/or agents knew the terms and conditions of the 12/21/2006 Agreement, specifically the agreed reference provisions that specified what information would be given when a reference inquiry was made by a potential employer of Lane.

118.    Notwithstanding the knowledge of UA's employees and/or agents, UA improperly communicated extremely negative, damaging and derogatory information concerning Lane's performance as a UA employee to Candido.  Such communication was a knowing and deliberate breach of the 12/21/06 Agreement.

119.    Following the communications between Candido and employees and/or agents of UA, Candido informed Lane that the prior oral agreement would not be honored and that Lane would not be offered a full time position by CAA.

**WHEREFORE** Lane requests that this court enter judgment for Lane and:

A. Award damages for UA's wrongful conduct in interfering with Lane's potential employment relationship with CAA in an amount greater than $75,000; and

B. Such other relief as this Honorable Court shall deem appropriate.

**COUNT V**

**<u>GREAT LAKES – BREACH OF CONTRACT</u>**

120.    The allegations in Paragraphs 1 – 119 above are incorporated in their entirety into this Count V as if pleaded herein.

121.    In February 2007, Great Lakes offered and Lane accepted a contact for employment (See Exhibit 1).

122.    On February 19, 2007, for no lawful reason, Great Lakes, breached its employment contract with Lane.

123.    Great Lakes informed Lane that it was cancelling the employment contract based on negative and damaging references received from UA.

124.    Lane was not in default nor had he failed to perform any of his obligations or conditions precedent in his employment agreement with Great Lakes.

125.    Great Lakes refusal to honor the contract of employment offered to and accepted by Lane caused Lane a substantial financial loss.

126.    Lane actively sought other full-time medical positions in an attempt to mitigate his damages but has been unable to secure another full-time position.

**WHEREFORE** Lane requests that this honorable court enter judgment for Lane and against Great Lakes:

A.  Award damages for Great Lakes wrongful conduct in terminating Lane in an amount greater than $75,000;

B.  Such other relief as this Honorable Court shall deem appropriate.

**COUNT VI**

**CAA – BREACH OF CONTRACT**

127.    The allegations in Paragraphs 1 – 126 above are incorporated in their entirety into Count VI as if pleaded herein.

128.    Shortly after Lane accepted a position as *locum tenens* at Masonic, Lane learned that Candido, a friend of many years, was the new incoming Chief of the Masonic Department.

129.    In September, 2007, Candido asked Lane if he was interested in joining his new group as a full time provider at Masonic.

130.    Lane and Candido discussed many aspects of employment including whether or not Lane would agree to take call and whether Lane would pay for his own insurance tail which costs approximately $80,000 to $100,000.

131.    Lane agreed to all the discussed terms.

132.    Candido's corporation, CAA, was scheduled to assume responsibility for the Masonic Department sometime after January 1, 2008.

133.    In the interim period, and while Lane was serving as a *locum tenens*, Candido asked Lane to "represent his interests" at Masonic and be his "eyes and ears" and to let him know about the competence and behavior of the anesthesia staff and the workings of the operating room.    Candido specifically asked Lane to "report any problems" he might see that would affect Candido's transition as the new chairman.

134.    Candido also asked Lane to work with and help teach residents.

135.    Lane agreed and subsequently fully performed all of Candido's requests.

136.    In reliance on Candido's offer of full-time employment and Lane's acceptance of all discussed terms, Lane abandoned his ongoing search for a full time teaching position in other hospitals/teaching centers in the Chicago area.

137.    When asked to do so, Lane provided all required references.  In addition, Lane had strong internal support (including 6 letters of reference) from attending physicians at Masonic.

138.    CAA's commitment to Lane was that satisfactory performance as *locum tenens* plus Lane's work in representing Candido's interest in the interim period (September 2007 through January 2008) would result in full time employment with CAA.

139.    When it became apparent to Lane that Candido was dragging his feet and might be reneging on his promise to reduce the oral employment agreement to writing, several members of the Anesthesia Department contacted Candido to support Dr. Lane as a solid addition to the Masonic Department and asked that he remain on staff.

140.    Lane clearly performed his part of the bargain, the bargain being that if Lane satisfactorily met all of the terms and conditions established by Candido, Lane would receive a written contract memorializing the terms of the oral agreement for a full

time permanent position under the same terms and conditions as positions were offered to other who would be joining CAA.

141.    In breach of its oral contract with Lane, CAA failed to send the promised written contract.

142.    Due to CAA's breach of its oral agreement to Lane for a full time contract of employment after Lane had fully performed his duties and responsibilities, Lane has suffered significant monetary damages.

143.    Lane is currently attempting to mitigate his damages by seeking other full-time employment but has been unable to find a similar position.

**WHEREFORE** Lane requests that this court enter judgment for Lane and:

A.  Award damages for CAA's wrongful conduct in breaching its contract with Lane in an amount greater than $75,000; and

B.  Such other relief as this Honorable Court shall deem appropriate.

## COUNT VII

## CAA – PROMISSORY ESTOPPEL

144.    The allegations in Paragraph 1 through 144 are incorporated in this Count VII as if pleaded herein.

145.    Candido made any number of requests of Lane to provide administrative services as well as quality clinical services.

146.    Candido clearly promised that compliance with his terms and conditions would result in an offer of full time employment with CAA under the same terms and conditions as had been offered to other physicians joining CAA.

147.    By and through his conduct, Lane clearly relied on the promise.

148.    Lane complied with the administrative requests that were made somewhat more difficult by Candido's style of communication and personal absence from the Masonic Department during the period from September 2007 through late January 2008.

149.    Given Lane's expression of interest in the full time position after the initial discussions in September 2007, Lane acted in reliance on the promise of full time employment and discharged the duties and responsibilities assigned to him by Candido.

150.    Candido, having known Lane for more than a decade and having worked with Lane at Cook County Hospital, knew that Lane would rely on his promises in that the full time position in the Masonic Department was a very desirable objective for Lane.

151.    Lane worked extremely hard to meet the requirements established by CAA and Candido to the significant benefit of both CAA and Candido and to the detriment of Lane.

152.    Lanes efforts, documented in the positive recommendations of members of the Masonic Medical Staff to Candido, are sufficient to estop CAA and Candido from offering Lane a full time position; such position to be on the same terms and conditions as any other member of the Masonic Department.

Wherefore Lane asks this Honorable Court to:

A.    Order CAA to offer Lane full time employment in the Masonic Department under the same terms and conditions and the contracts of employment of other members of the Masonic Department; or

B.    enter judgment against CAA in the amount of more than Seventy Five Thousand ($75,000) dollars; or

C.    such other relief as this Honorable Court deems appropriate.

## JURY DEMAND

The Plaintiff, by counsel, hereby demands a trial by jury for counts I through VII

pursuant to Rule ____*38*____ of the Federal Rules of Civil Procedure.

Respectfully Submitted,


/s/   Mark D. Olson
Mark D. Olson
One of Lane's Attorneys


Mark D. Olson
Attorney for Plaintiff
Stitt Klein Daday Aretos & Giampietro, LLC
#500 – 121 S. Wilke Road
Arlington Heights, IL 60005

(tel) 847.590.8700
(fax) 847.590.9825

February 13, 2007

Philip Edward Lane, M.D.
635 North Dearborn Street
Apartment 1805
Chicago, IL  60610

Dear Dr. Lane:

Welcome to Great Lakes Anesthesia!  We are certainly looking forward to working with you.  Cheryl Cook, our office manager, and I will be taking care of everything we possibly can to make your professional life as trouble free as possible.

There are a variety of documents that I will need as I begin the process of credentialing you with our facilities, insurance companies and networks.  When I receive your documents and professional information, I will then complete as much of the many applications as I can prior to sending them on to you for signature.  Below is a list that I will need at your earliest convenience.  I thank you in advance for your cooperation.

1. All State Licenses, CSRs

2. DEA Certificate(s)

3. Degrees and Diplomas

4. All Previous Medical Liability Company Names/Need Dates & Policy Numbers for Each

5. Board Certification(s)

6. CPR, ACLS, PALS, etc.

7. Notorized Copy of Driver's License (Clear Copy:  Must be Able to See Photo), Copy of Social Security Card and Additional Photo

8. Three References (Include Addresses and Phone Numbers)

9. Current Curriculum Vitae with All Previous Hospital Affiliations, Surgery Centers, etc.

10. Name Changes & Dates that Correspond to Each

11. Date of Birth, City & State of Birth

12. NPI Notification Letter (if you have it) or the name of the person or organization from which it was obtained for you.

13. UPIN Number

14. Medicare Number

15. Medicaid Number

Exhibit 1 – 10 Pages

Philip Edward Lane, M.D.
February 13, 2007
Page Two


Employment forms will also be sent to you for your completion.  If you choose to enroll, health insurance and dental insurance will begin on day one of your employment.  Our health insurance provider is Principal.  You have the choice of three different networks: Sagamore; Indiana Health Network; and PHCS.  Long Term Disability, Dental and Life insurances are handled by Guardian.  At no cost to you, we provide LTD as well as a $25,000.00 life insurance policy.

Enrollment for our 401K plan occurs twice a year in January and July.  You must have completed six months of employment to qualify for the enrollment of the 401K plan.

Congratulations on making an excellent employment decision!  Please call if you have questions or if there is anything we can do for you.

Sincerely,



Linda Anderson, RN
Practice Manager


OWNERS:
James J. Carr, CRNA
Rob Colcord, CRNA
Paul Henderson, CRNA
Dana M. Hoffman, D.O

# GREAT LAKES ANESTHESIA, P.C.
# EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement') is entered into by and between Great Lakes Anesthesia, P.C. ("Corporation") and  Philip Edward Lane, M.D.  ("Provider").

**WITNESSETH:**

**WHEREAS,** Corporation is a professional corporation comprised of physician anesthesiologists and independent practice certified registered nurse anesthetist ("CRNAs") who provide anesthesia services to the residents of Indiana; and

**WHEREAS,** Corporation and Provider desire to enter into an employment relationship whereby Provider will be employed by Corporation to provide anesthesia services pursuant to the terms and conditions set forth below.

**NOW, THEREFORE,** in consideration of the mutual covenants as contained herein, the parties agree as follows:

## ARTICLE I
## EMPLOYMENT AND PROFESSIONAL SERVICES

1.1     Employment. Corporation hereby employs Provider, and Provider accepts such employment, to provide anesthesia services on behalf of Corporation pursuant to this agreement. Provider shall render such services at hospitals, surgical centers, physician offices and other facilities at mutually agreed upon by Corporation and Provider and consistent with Provider's clinical privileges therein. In rendering such services hereunder, Provider shall be accountable to Corporation's Board of Directors or designee.

1.2     Full Time Practice. Provider agrees to provide anesthesia services on a full time basis, less time off for vacation and other allowable events, all consistent in time and scope with usual and customary work schedules of the Corporation's other providers. Corporation reserves the right to adjust the compensation and benefits set forth in this Agreement.

1.3     Professional Anesthesia Services.  Provider shall provide the following professional services:

    (a) Deliver all anesthesia services to patients, including those services usually and customarily provided by anesthesiologists and CRNAs.

    (b) Provide mutually agreed upon on-call coverage as reasonably requested by Corporation and as mutually arranged with Corporation's other providers. Provider agrees to submit to Corporation a mutually agreed upon coverage schedule.

    (c) Maintain accurate and complete records of services provided to patients;

    (d) Assist in the development and implementation of a quality assessment program consistent with the needs of the organization for accreditation, licensure or other desired purpose; and

    (e) Provide such other anesthesia services as may be reasonably requested by Corporation.

1.4   Administrative Services. Provider shall provide the following administrative services in conjunction with Corporation's other providers:

   (a) Oversee compliance with applicable policies and requirements of licensing, regulatory, and accrediting bodies relative to the Corporation;

   (b) Submit timely and accurate billings for services and assist Corporation as needed with third-party billing matters, including Medicare and Medicaid, and private third-party payors;

   (c) Maintain effective liaison with surgeons and other physicians who may require anesthesia services;

   (d) Participate in and abide by the Corporation's quality assessment and other peer review programs; and

   (e) Abide by Corporation's rules, policies and procedures and perform other administrative duties and responsibilities as may be reasonably requested by Corporation.

1.5   Managed Care Programs. Provider shall participate in Medicare, Medicaid and all other payor contracts and managed care plans (such as HMOs and PPOs) that Corporation deems appropriate as well as abide by the requirements of such programs, contracts and plans. In the event any payor or managed care plan seeks to contract with Provider for anesthesia services directly. Provider shall only execute a contract upon such terms and conditions as approved by Corporation.

1.6   Physicians Provider Qualifications. If Provider is a physician, then throughout the term of this agreement, Provider shall: (a) hold a valid and unlimited license to practice medicine in the state of Indiana; (b) hold a valid and unrestricted federal DEA and state CSR permit; (c) remain a qualified provider under the Indiana Medical Malpractice Act; and (d) remain current in the practice of anesthesiology.

1.7   CRNA Provider Qualifications. If provider is a CRNA, then throughout the term of this agreement, Provider Shall; (a) hold a valid license to practice nursing in the state of Indiana; (b) remain certified by the American Association of Nurse Anesthetist Councils on Certification and Recertification of Nurse Anesthetist; (c) remain a qualified provider under the Indiana Medical Malpractice Act; and (d) remain current in the practice of nurse anesthesia.

1.8   Institution Privileges/Compliance with Law. Provider shall maintain in good standing appropriate privileges in anesthesia at institutions as mutually agreed upon. Provider shall comply with the bylaws, policies and procedures of all outpatient clinics, hospitals and institutions in which privileges are held. Provider agrees that all services provided pursuant to this Agreement shall be performed in compliance with all applicable federal and state laws, regulations and standards governing such services.

1.9   Practice of Anesthesia. The parties acknowledge that the anesthesia services to be performed by Provider, whether a physician or CRNA shall be the sole responsibility of Provider, based upon Provider's independent, professional judgment, and that Corporation shall neither have nor exercise any control or direction over the methods used by Provider in the performance of said services.

1.10    Conflict of Interest. **Unless otherwise agreed to in writing,** Provider shall provide all anesthesia services exclusively through Corporation. Providers shall not accept employment or contractual obligations with any other entity, organization or individual providing anesthesia services or in need of anesthesia services without Corporation prior written approval. In addition, Provider shall not have any ownership interest in any organization providing anesthesia services without Corporation's prior written approval.

## ARTICLE II
## OBLIGATIONS OF CORPORATION

2.1    Billing and Collections. Corporation shall determine, bill and collect any fees and including    those services covered by the Medicare and Medicaid programs. Corporation shall be responsible for collection of such fees; however, Provider shall cooperate with and assist Corporation in the collection of such fees and charges. Provider hereby assigns to Corporation all rights to such billings. If Provider receives any fees, said amount shall be promptly turned over to Corporation. Provider agrees that the sole compensation for the anesthesia services contemplated herein shall be the compensation paid by Corporation pursuant to Article IV hereof.

2.2    Professional Liability Insurance. Corporation shall provide medical malpractice insurance so as to qualify Corporation and Provider and providers under the Indiana Medical Malpractice Act. (I.C.27-12, et seq.) with respect to the provision of services as contemplated herein. Provider shall only be covered by such professional liability coverage while acting within the scope of employment with Corporation. Such coverage shall not apply to those acts that occurred prior to Provider's employment, and Provider shall retain coverage for such acts.

2.3    Professional Support. Corporation shall provide such professional support (i.e., pager, cellular phone) as mutually agreed.

2.4    Marketing. Corporation, in consultation with Provider, shall market the services provided by Provider.

## ARTICLE III
## COMPENSATION, BILLING, AND ASSIGNMENT

3.1    Compensation and expenses. In consideration of the anesthesia services to be provided by Provider hereunder, Corporation agrees to compensate Provider pursuant to the amount and methodologies contained in Exhibit A which is attached hereto and made a part hereof said compensation, less appropriate taxes and other authorized deductions, shall be paid at such times and intervals as other salaried or hourly employees of the Corporation are paid and may be amended from time to time by Corporation. In addition, Corporation may provide reimbursement for legitimate business expenses, as it deems appropriate in its sole discretion. Provider shall pay all taxes, penalties and interest on such business expenses denied as allowable business expenses by the Internal Revenue Service.

3.2    Employment Benefits. As additional compensation, Provider shall be entitled to those Employee benefits otherwise available to salaried or hourly employees of the Corporation as set forth in Exhibit B, which is attached hereto and made a part hereof and which may be amended from time to time by Corporation. Provider agrees to accept and comply with any employee benefit policies as adopted and amended by Corporation.

# ARTICLE IV
# TERM AND TERMINATION

4.1     Term. The term of this Agreement shall commence on the _____ day of _____, 2007, and shall continue for a term of one (1) year. Thereafter, this Agreement shall be renewed automatically for successive one (1) year terms unless either party gives 90 days written notice of its intent to terminate prior to the end of the then current term.

4.2     Termination. This Agreement shall terminate on the occurrence of any day of the following events:

    (a) Termination: Probation Period. The employee or employer may terminate this agreement without cause at any time during the first 30 days of this agreement with written notice.

    (b) Termination by Agreement. This Agreement may be terminated at any time upon the terms set forth in a written document signed by both parties.

    (c) Termination Without Cause. Either party may terminate this Agreement, at any time, by providing the other party 90 days prior written notice of such termination.

    (d) Termination For Cause. Either party may terminate this Agreement for cause in any substantial manner for a period of thirty (30) days after receipt of written notice of such default. Repeated violations are grounds for immediate termination of this Agreement.

    (e) Immediate Termination. Corporation may terminate this Agreement for cause at its sole option, immediately upon providing written notice, in the event that one or more of the following occurs: (i) Provider is convicted of a felony or offense involving moral turpitude; (ii) Provider's license is suspended, revoked or limited; (iii) Provider breaches a fiduciary responsibility to the Corporation, including engaging in fraud with or embezzlement from the Corporation; (iv) Provider's DEA or CSR permit is suspended, revoked or limited; (v) Provider performs anesthesia service for compensation outside this Agreement without approval by the Corporation; (vi) Provider no longer is qualified under the Indiana Medical Malpractice Act.

    (f) Death/Disability. This Agreement shall automatically and immediately terminate without notice upon Provider's death in the event Provider becomes disabled and is unable to perform the essential functions hereunder for a 12 month continuous period with or without reasonable accommodation; Corporation may terminate this Agreement upon 30 days notice.

4.3     Effect of Termination. Upon termination of this Agreement, neither party shall have any further obligation hereunder except for (i) obligations accruing prior to the date of termination, and (ii) obligations, promises, nor covenants contained herein which are expressly made to extend beyond the term of this Agreement

4.4     Payment upon Termination. Upon termination of this Agreement, Corporation shall within 30 days of termination, compensate Provider for the amount of hours worked during the Provider's last pay period.

4.5    <u>Covenant Not to Compete</u>.  Upon termination, other than if Provider terminates this Agreement for cause, Provider agrees not to provide anesthesia services, directly or indirectly, for a period of twelve (12) months at the specific facilities where Corporation has assigned anesthesia providers to provide anesthesia services within the twelve-month period immediately prior to the termination date.

# ARTICLE V
# <u>MISCELLANEOUS</u>

5.1    <u>Access to Books and Records</u>.  The parties agree to treat this Agreement as a "contract" within the purview of &186(v)(1)(1) of the Social Security Act (&952 of the Omnibus Reconciliation Act of 1980) and the regulation promulgated in implementation thereof at 42 C.F.R. Part 420, and for four (4) years after the furnishing of services hereunder, to make available to the Comptroller General of the United States, the Department of Health and Human Services and their duly authorized representatives, access to the books, documents, and records and such other information as may be required by the Comptroller General of Secretary of HHS to verify the nature and extent of the costs of services provided by Provider. If Provider carries out the duties of the contract through a subcontract worth $10,000.00 or more over a twelve (12) month period with a related organization, the subcontract will also contain an access clause to permit access by the Secretary, Comptroller General, and their representatives to the related organization's books and records.

5.2    <u>Assignment</u>.  No assignment of this Agreement or of the rights or obligations hereunder shall be valid without the specific written consent of the parties hereto.

5.3    <u>Confidentiality</u>.  Corporation and Provider agree that the terms and conditions of this Agreement shall remain confidential. Neither Corporation nor Provider shall distribute this Agreement or any part thereof or reveal any of the terms of this Agreement to parties other than their spouses, legal or counting advisors, agents, or as may be required by law. Further, Provider shall not disclose any proprietary data or other confidential information of the Corporation, which shall include, but not be limited to, the following: Corporation's business documents and financial methods and practices, pricing and marketing techniques, file or data base materials, computer programs, lists of patients and data on suppliers. As long as such matters remain proprietary data or other confidential information of the Corporation. Provider will not disclose or use such data or information in any way or in any capacity other than to further Corporation's interest. This provision shall survive the termination of this Agreement, regardless of cause. Notwithstanding this Section 5.3, the Corporation, upon approval agrees in writing to keep the terms and conditions confidential.

5.4    <u>Entire Agreement Modification</u>. This Agreement constitutes the entire agreement of the parties concerning the subject matter hereof and supersedes all previous representations, understandings, and agreements of the parties, whether oral or written, concerning same. This Agreement may only be modified by a written document signed by the parties hereto.

5.5    <u>Governing Law</u>. This Agreement shall be construed pursuant to the laws of the State of Indiana.

5.6    <u>Notices</u>. All notices required to be given under this Agreement shall be in writing. A notice shall be deemed to have been given at the time when mailed by U.S. Mail or hand delivered. Notices shall be given for each party to the individual and address listed below unless notice is given otherwise:

**CORPORATION**                          **PROVIDER**
James J. Carr, CRNA, President           Philip Edward Lane, M.D.
Great Lakes Anesthesia, P.C.             635 North Dearborn Street, Apt. 1805
500 N. Nappanee Street, Ste. 11- B       Chicago, IL  60610
Elkhart, IN  46514

5.7    Severability. In the event that any provision hereof is found invalid or unenforceable pursuant to judicial decree or decision, the remainder of this Agreement shall remain valid and enforceable according to its terms.

5.8    Status of the Parties. In performing anesthesia services hereunder, Provider is acting as a Corporation employee, and not as an independent contractor.  Corporation shall report, withhold, and/or pay all applicable federal and state taxes payable on the compensation earned by Provider hereunder.

5.9    Wavier of Breach. The wavier by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a wavier of any subsequent breach of the same or other provisions hereof.

# ARTICLE VI
# EXECUTION

**IN WITNESS WHEREOF,** Provider and Corporation, by its duly authorized officer, have executed this Agreement on the dates set forth below.

**GREAT LAKES ANESTHESIA, P.C.**              **PROVIDER**


By:_____, President     By:_____
    James J. Carr, CRNA                              Philip Edward Lane, M.D.


Date:_____                Date:_____

OWNERS:
James J. Carr, CRNA
Robert J. Colcord, CRNA
P. Paul Henderson, CRNA
Dana M. Hoffman, D.O.

Philip Edward Lane, M.D.                                                    6

# Exhibit A
# Great Lakes Anesthesia, P.C.
# Full Time Board Certified Physician Compensation Package
### Philip Edward Lane, M.D.

I.     <u>Salary of Full Time Physician</u>

Board Certified PHYSICIAN providers who provide Twenty (20) scheduled shifts of anesthesia services shall receive a salary of Two Hundred Forty Thousand dollars ($240,000.00) per year. The definition of one scheduled shift for the purposes PHYSICIAN compensation includes the following:

1. 12-hour period of obstetric coverage. (A 24-hr shift is broken down into two shifts for payroll purposes.)
2. 12-hour period of O.R. call coverage.
3. Surgery day coverage. This time period runs from the start of the surgery schedule to the end of the surgery schedule at each facility.
4. Day shift is 6 or 7 a.m. to 6 or 7 p.m. depending upon the facility.
5. Night shift is 6 or 7 p.m. to 6 or 7 a.m. depending upon the facility.

Overtime compensation: You will be guaranteed eight extra shifts per month. This could constitute one weekend and one day per week call. If you elect to work these extra shifts, it would total $7,400.00 per month or $77,700.00 per year, which would make your total annual salary $317,700.00. If you wish, and more overtime is available, we could also schedule you above the 28 shifts.

If a physician has not yet received a passing grade on the ABA written exam after two years from his/her graduation date, said physician shall be compensated 10% less salary per year. Upon receiving a passing grade on the written exam, the physician shall be paid 5% less than a board certified physician.

II.     <u>Extra Shifts</u>

PHYSICIAN providers may work shifts in addition to the Twenty (20) scheduled shifts of anesthesia services. Extra shift means any additional shift worked other than the Twenty (20) scheduled shifts. In addition to the above referenced salary, the PHYSICIAN provider will be compensated $925.00 (the value of one shift of the full time salary as calculated per diem for board certified physicians) based on 261 working days per year.

III.     <u>Incentives</u>

Great Lakes Anesthesia, P.C. has determined that certain incentives specific to the day or facility be created. They are as of April 29, 2004 as follows:

1. Five Hundred dollar ($500.00) bonus for working the day shift on a major holiday. Major holidays are New Years Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving and Christmas Day.

IV.     <u>Vacation</u>

Full time PHYSICIAN providers are provided Six (6) weeks of paid vacation per year. PHYSICIAN provider and corporation may mutually agree on the purchase of additional unpaid vacation time.

V.     <u>Payment Upon Termination</u>

Upon termination, PHYSICIAN provider may receive payment pursuant to the terms of Article IV of the Employment Agreement. PHYSICIAN provider compensation shall be based on days worked.

Signed: _____
James J. Carr, CRNA, President

Signed: _____
Philip Edward Lane, M.D.

EXHIBIT A: Philip Edward Lane, M.D.

# Exhibit B
# Great Lakes Anesthesia, P.C.
# Employee Benefits

1.   Professional Liability Insurance – premium paid by corporation.

2.   Group Disability Insurance in the amount of $60,000.00 – premium paid by corporation.

3.   Group Health Insurance.  Corporation will pay 25% of premium for individual or family.

4.   Group Dental Insurance. Corporation will pay 25% of premium for individual or family.

5.   Cellular phone – provided and paid by corporation

6.   Pager – provided and paid by corporation

7.   401K – expenses paid by corporation

8.   Six (6) weeks or Thirty (30) days of paid vacation per year.  At any time only one (1) week or Five (5) vacation days may be carried over from year to year. Any remaining vacation time will be paid out at the end of the year.  One day of vacation will be added for every year of service.

9.   Four (4) days of paid sick leave per year for hospitalization or outpatient surgery.  Sick days may not be carried over from year to year.

10.  Flex 125 Program – Payroll deduction for medical expenses.  Expenses paid in pre-tax dollars.


Signed: _____
James J. Carr, CRNA, President


Signed: _____
Philip Edward Lane, M.D.


EXHIBIT B LANE

## SETTLEMENT AND SEPARATION AGREEMENT

This Settlement and Separation Agreement (the "Agreement") is made and entered into as of this 21st day of December, 2006, by and between **UNIVERSITY ANESTHESIOLOGISTS, S.C.**, an Illinois medical corporation ("Employer") on the one hand, and **PHILIP LANE, M.D.** ("Dr. Lane"), on the other hand.

### WITNESSETH:

**WHEREAS**, Employer is a Medical Corporation organized and existing under the laws of the state of Illinois for the purpose of rendering Anesthesiology and related services to the public, with its principal office in Chicago, Illinois; and

**WHEREAS**, on or about December 18, 2001, Employer and Dr. Lane entered into an Employment Agreement (the "Employment Agreement") wherein, *inter alia*, Dr. Lane agreed to provide anesthesiology and related services to patients in exchange for the remuneration specified therein; and

**WHEREAS**, due to disputes which have arisen between them, the parties hereto have determined that it would be in their respective best interests to mutually terminate the Employment Agreement, effective at midnight on December 31, 2006; and

**WHEREAS**, for the sole purpose of avoiding the risk and expense of proceedings between them regarding their disputes, the parties hereto have concluded this Agreement to amicably settle and resolve all disputes between them.

**NOW, THEREFORE**, for and in consideration of the mutual promises, covenants and undertakings hereinafter set forth, and for other good and valuable consideration, the receipt, adequacy and sufficiency of which is hereby acknowledged by each party from the other, the parties hereto agree as follows:

1. <u>Recitals.</u>  The recitals hereinabove set forth are incorporated herein by reference as if fully set forth herein and they are hereby made an integral part of this Agreement.

2. <u>Last Date Of Employment – Resignations.</u>  Dr. Lane acknowledges that his last date of employment with Employer shall be December 31, 2006 (the "Termination Date"). Employer acknowledges that Dr. Lane will be deemed to have resigned from such employment as of the Termination Date. In addition, Dr. Lane agrees that he will resign from his appointment to the Medical Staff at Rush University Medical Center effective as of midnight on the Termination Date and from his faculty appointment at Rush University effective at midnight on June 30, 2007.

— **Exhibit 2 – 6 Pages** —

3. **No Admission Of Liability.** Dr. Lane and Employer each understand and agree that the making of this Agreement as well as the covenants and conditions contained herein in no way constitute any admission of fault, breach, or wrongdoing on the part of any party hereto.

4. **Payment of Amounts Due Under Employment Agreement; Tail Coverage.** Employer agrees to compensate Dr. Lane in accordance with the Employment Agreement through the Termination Date. In addition, Employer agrees to provide to Dr. Lane, at Employer's expense, an extended reporting endorsement ("tail coverage") from the malpractice carrier insuring Dr. Lane immediately prior to the Termination Date.

5. **Severance Payment.** In addition to the amounts due Dr. Lane under the Employment Agreement as provided in the next preceding paragraph, within 14 days after the Termination Date, Employer agrees to pay to Dr. Lane the gross sum of Seventy Five Thousand and no/100 Dollars ($75,000.00) (the "Gross Payment"), and to issue to Dr. Lane, at the appropriate time, a Form 1099 reflecting said Gross Payment. In this regard, Dr. Lane agrees to indemnify, defend and hold harmless Employer, its officers, directors, shareholders and employees from and against any tax, interest, penalty, loss, cost, damage or expense proposed, assessed against or incurred by Employer or any of them (including, without limitation, reasonable attorneys' fees and accountants' fees) which relate to or arise from the making of the Gross Payment, the delivery of the Form 1099, the non-withholding of Dr. Lane's share of FICA, the non-payment of Employer's share of FICA and/or the non-withholding or the non-payment of any other state or federal tax relating to the Gross Payment.

6. **Retirement Plan(s).** Employer, as plan administrator of any Retirement Plan(s) covering Dr. Lane, agrees that within an administratively feasible time period following Dr. Lane's filing of appropriate distribution forms to be furnished by Employer, or within such time as specified in any applicable retirement plan document, his entire vested account balance under any existing plan(s) shall be paid to him or such other entity as he may appropriately direct payment to in accordance with the terms of any such plan(s) and applicable federal law.

7. **Expense Reconciliation.** In accordance with the Employment Agreement and Employer's reimbursement policy, Dr. Lane shall submit to Employer any and all reimbursable expenses incurred by him by the close of business on December 8, 2006 to be paid to Dr. Lane in accordance with the Employment Agreement and the reimbursement policy.

8. **Dr. Lane's Continuing Obligations -- Cooperation.** Dr. Lane shall have the continuing obligation to promptly prepare and/or complete all necessary medical records and to cooperate fully with respect to the billing of all services provided by him. Furthermore, Dr. Lane shall have the continuing obligation

2

to promptly remit to Employer any and all payment(s) received by him, or by anyone on his behalf, from any individual or payor pertaining to medical services rendered by him while an employee of Employer, endorsed in such a manner so as to allow Employer to deposit said funds into its bank account. In addition, Dr. Lane shall reasonably cooperate with Employer in Employer's attempts to collect sums due from any source for services performed by Dr. Lane while an employee of Employer.

9.  **Compliance With Covenants Under Employment Agreement**. Notwithstanding Dr. Lane's resignations referred to in paragraph 2 hereof, Dr. Lane agrees to comply with all covenants and obligations contained in the Employment Agreement, including, but not limited to, the Covenant of Employment contained in Section 17 thereof which survives termination.

10.  **Release Of Employer By Dr. Lane**. Dr. Lane and his representatives, heirs, next of kin, executors, administrators, attorneys, agents and assigns do hereby release and forever discharge Employer and its and each of its respective officers, directors, shareholders, trustees, employees, beneficiaries, heirs, next of kin, executors, administrators, attorneys, representatives, affiliates, predecessors, successors, agents and assigns of and from any and all claims, actions, causes of action, rights, suits, debts, sums of money, accounts, controversies, grievances, obligations, charges, damages, costs, expenses, attorneys' fees, and demands, of any and every kind, nature, and character, known or unknown, in law or equity, enforceable under any local, state, or federal common law, constitution, statute, regulation, or ordinance, including (but not limited to) any action for breach of contract, defamation, tort, intentional or negligent infliction of emotional distress, interference with contractual relationships, interference with economic advantage, for unpaid wages (under the Illinois Wage Payment and Collection Act or otherwise), or for any claims arising under any whistle blower or anti-discrimination law, including but not limited to the Americans with Disabilities Act, the Age Discrimination in Employment Act, the Older Worker's Benefit Protection Act, Title VII of the Civil Rights Act, the Civil Rights Act of 1991 and the Illinois Human Rights Act which Dr. Lane may have had, now has or hereafter may have, by reason of any matter or thing whatsoever existing at any time prior to and including the date of this Agreement. **Provided, however**, this Release (a) shall not limit Dr. Lane's right to sue, defend, counterclaim, crossclaim or third party claim against Employer with regard to any matter involving or relating to any third-party allegation(s) of professional negligence and/or strict liability in connection with the provision of professional medical and related services to patients during the period of Dr. Lane's employment with Employer, and/or (b) shall not release Employer of and from obligations, if any, owing to Dr. Lane under any retirement plan(s) existing as of the date of this Agreement, and/or (c) shall not bar any action for enforcement of this Agreement.

11. **Confidentiality And Non-Disclosure.** The parties hereto each agree that they will keep confidential and not disclose the existence and terms of this Agreement to anyone, except that the same may be disclosed to their respective lawyers, accountants, auditors, financial planners, lenders and tax advisors, or as otherwise may be required by federal or state taxing bodies, by law or by court order.

12. **Modification Of This Agreement: Contents.** This Agreement may be modified only by a writing duly signed by all parties hereto. Furthermore, it is understood and agreed that no promises, representations, understandings, or warranties have been made by any party respecting the subject matter hereof other than those which are expressly contained herein.

13. **Reference.** Employer shall respond to any inquiry, request for information or request for a letter of reference concerning Dr. Lane, whether made orally or in writing, only by sending a written response in the form attached hereto as Exhibit A.

14. **Entire Agreement.** This Agreement constitutes the entire Agreement between the parties and supersedes all other prior agreements, promises, representations, warranties, understandings, and negotiations, written or oral, between the parties hereto respecting the subject matter hereof. This Agreement shall become effective and binding on the parties hereto on the eighth (8th) day after the date it is signed by Dr. Lane ("the "Effective Date"). Dr. Lane may revoke this Agreement during this seven (7) day revocation period prior to the Effective Date by delivering a written notice of revocation to Employer at its principal office. This Agreement shall automatically become final and binding on the parties hereto if notice of revocation is not delivered to Employer within seven (7) days of Dr. Lane's execution of this Agreement.

15. **Acknowledgment.** The undersigned declare that this entire Agreement has been carefully read by each of them, that each has had the benefit of counsel with respect thereto, that the contents thereof are fully known and understood by each of them, and that the same is signed as the free and voluntary act of each of them with the intent that each be legally bound thereby. In addition, Dr. Lane acknowledges that he has been given at least twenty-one (21) days to review and consider this Agreement prior to signing it. He affirms that if he elects to sign it before the expiration of twenty-one (21) days, his signature will indicate conclusively that he has voluntarily (and on the advice of counsel) chosen to waive the full twenty-one (21) day period.

16. **Binding Effect.** This Agreement shall be binding upon the parties hereto and their respective predecessors, successors, officers, directors, employees, representatives, attorneys, heirs, next of kin, executors, beneficiaries, estates, administrators, agents and assigns.



17. **Warranty Of Authority.** The person signing below for and on behalf of Employer represents and warrants that he/she has the authority to sign this Agreement for and on its behalf and to legally bind the same.

18. **Law Of Illinois.** This Agreement shall be construed, enforced and governed in all respects by the laws of the State of Illinois irrespective of the fact that any party is or may become a resident or domiciliary of a different state.

19. **Severability.** If any portion or portions of this Agreement shall be, for any reason, invalid or unenforceable, the remaining portion or portions shall nevertheless be valid, enforceable and carried into effect, unless to do so would clearly violate the present legal and valid intentions of the parties hereto.

20. **Settlement Agreement Not To Be Construed Against Drafter.** The provisions of this Agreement shall be interpreted in a reasonable manner to effect the purposes of the parties, and this Agreement shall not be interpreted or construed against any party to this Agreement because that party or any attorney for that party drafted this Agreement or participated in the drafting of this Agreement, and the parties expressly waive any law, common law or court decision to the contrary.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year first written above.

UNIVERSITY ANESTHESIOLOGISTS, S.C.

By: _____     _____
                                         PHILIP LANE, M.D.

Its _____

5

**EXHIBIT A**

**[TO BE WRITTEN ON UNIVERSITY ANESTHESIOLOGISTS, S.C.
STATIONERY]**

[Date]

[Name of addressee]
[Address of addressee]
[City, State and Zip of addressee]

Re:    **Philip Lane, M.D.**

Dear [Name of addressee]:

This correspondence is in response to your recent inquiry concerning Philip Lane, M.D. Dr. Lane was a member of our group from December 28, 2001, until he resigned on December 31, 2006 to pursue other professional goals. Prior to his resignation, Dr. Lane practiced anesthesiology at Rush University Medical Center for approximately 5 years.

Very truly yours,

**UNIVERSITY ANESTHESIOLOGISTS, S.C.**

By: _____